WORCESTER A. DICKERMAN *et al.*, Appellants, *v.* WILLIAM T. BURGESS *et al.*, Appellees.

## APPEAL FROM WINNEBAGO.

In equity, a party to a suit, as also his attorney, if he purchases property sold under an execution, is chargeable with notice of all irregularities attending the sale.

A party cannot claim a benefit, or the aid of a court of equity, who has been guilty of *laches* in protecting his rights, unless such *laches* may be imputable to the party claiming against him.

If a sheriff makes a sale of real estate by merely indorsing it on the execution, and making out a certificate of sale, without going to the court-house door, without any outcry or bidders, or any circumstance to arrest public attention, or to indicate that a sale was going on, and returned the execution, satisfied by a sale, to the plaintiff's attorney, who was the assignee of the judgment, but sent a certificate of sale to a person indicated by said attorney, the attorney will be held to be the purchaser, although the sheriff should subsequently have amended his return, so as not to have it appear that the attorney became the purchaser.

In such a case, where the holder of the certificate of sale, who disclaimed all knowledge of or interest in the transaction, assigned it to a brother of the attorney, and he to a cousin, under such suspicious circumstances as showed a design to conceal a wrong, they will all be held as acting in trust for the benefit of the attorney, and all the proceedings will be set aside for the irregularities and fraud connected with them.

Gross inadequacy of price, under such circumstances, should be considered in the conclusion to be arrived at.

There should be entire uniformity in the return to the execution, the certificate of sale, and the deed where real estate is sold, or they will be invalid.

A certificate of sale by a sheriff to another person than the purchaser, shown by his return to the execution, is a void act.

A bid by letter may be recognized by the sheriff, if it is announced by him; and if there is no advance upon that bid, he may sell upon it.

The decree in the Circuit Court of Winnebago was pronounced by Sheldon, Judge, at February term, 1858. The proceedings and proofs are fully stated in the opinion of the court.

J. Marsh, and G. Goodrich, for Appellants.

W. T. Burgess, for Appellees.

Breese, J. The bill in this case, originally filed by Alden Thomas in his lifetime, and revived by the complainants, who are his legal representatives, alleges dealings between him and one of the defendants, H. O. Stone, for several years, a suit by Stone against him, and a judgment in March, 1850, in favor of Stone, for forty-five dollars. That William T. Burgess, another defendant, was the attorney of Stone, to whom Thomas paid the amount due, except fifteen dollars which Burgess claimed as his fees for collection, and which, by an arrangement between him and Burgess, was to be the only question of controversy on the trial of the suit; that Burgess was the principal witness on the trial, and on his testimony Stone obtained a judgment for thirty dollars more than he had claimed; that Burgess admitted he had been mistaken in his testimony, and agreed to have the matter fairly arranged; that execution was issued on the judgment in June, 1850, on which Thomas paid thirty-one dollars and the costs, which Burgess, Nov. 13, 1850, received. Complainant remonstrated to Burgess against having to pay more, and complainant and the sheriff, who had the execution, both understood that Burgess accepted that amount in full satisfaction of the judgment. That complainant then had property, and agreed with the sheriff to pay the balance at any time, if required. The execution was returned by order of Burgess, and complainant heard nothing more of the matter until January, 1854, when an execution was issued for the balance; that he then told the sheriff the facts of the case, and arranged with him to wait until complainant could write to Burgess, and if he found Burgess insisted on the payment, then he would pay it at once. He alleges he did write, but receiving no answer and hearing nothing more of it, either from Burgess or the sheriff, he supposed Burgess had given up pressing the matter and forgot all about it until informed that his property had been sold, and a deed executed by the sheriff. The property sold by the sheriff, was a lot and building in Rockford, worth about five thousand dollars, and at the same time complainant had other real estate and personal property unincumbered in Rockford, out of which the execution might have been satisfied. That

complainant had no knowledge of any step having been taken by the sheriff until he learned, in September, 1855, that the lot had been sold on the execution and the sheriff's deed executed and recorded; that sheriff pretended to sell the lot on the 10th June, 1854, but had not advertised it for sale, as required by law. He did not offer it at public auction, nor cry it for sale; no person was present or knew of the sale; no bid whatever was made; and alleging that the sheriff did no act of making the sale except to make this indorsement on the execution: " Made the amount of the within execution by sale of property described in levy hereon to William T. Burgess, plaintiff's attorney, as per his receipt attached hereto; received my fees, and paid clerk his fees. K. H. Milliken, sheriff." Complainant charges that this indorsement, though bearing date June 10th, 1854, was not made until some time afterwards, when another indorsement was made as follows: " Received thirty-eight dollars $\frac{33}{100}$ from sale of land within described. H. O. Stone, by W. T. Burgess, assignee." Charges that the " said " indorsement was made by the sheriff by the express directions of Burgess, without any reference to any sale having been made of the premises at any time or place, and that no money was paid, etc. ; that Burgess was acting both as the attorney and assignee, but insists that the whole proceeding had been carried on without the knowledge of Stone for the sole profit of Burgess. Charges that about the 17th June, 1854, Burgess induced the sheriff to execute a certificate of sale to one J. F. Farnsworth, his law partner; that Farnsworth resided at Chicago and had no knowledge of the matter and no interest in it, nor consented to have his name so used, and that Burgess' sole object in using Farnsworth's name was the more effectually to conceal his own fraud; that Farnsworth assigned the certificate July 10, 1854, to John S. Burgess, without any consideration; that on Sept. 12th, 1855, the then sheriff Taylor executed a deed to J. S. Burgess, a brother of defendant; that J. S. Burgess paid no consideration for Farnsworth's assignment, and that it is in defendant's handwriting, nor had he any agency in procuring the deed to himself or knowledge of it; that he had no pecuniary means; that as soon as complainant found out the condition of things, he went to Chicago and offered to pay defendant, W. T. Burgess, fifty dollars if he would arrange it, but that Burgess refused to give him any satisfaction, and alleging that the title was in his brother, J. S. Burgess, and was beyond his control, and that his brother was absent in California, which complainant alleges was not true, but was at the time in Chicago. That on the 13th Sept., 1855, J. S. executed a quit claim deed to his cousin, Samuel P. Burgess, defendant, for the consideration of $3,000,

but that in fact he paid nothing for the conveyance; that he is a young man without means, a relation of W. T. Burgess, and that it was a scheme of W. T. further to conceal the true condition of his own interest and connection with the property, and that no person claims any interest in it except W. T. Burgess, and that these persons are used as means to carry out his fraudulent designs; that W. T. Burgess has caused notice to be served on the tenants of the property to quit, for the purpose of commencing an action of ejectment; that complainant has, ever since the judgment and sale, had the open and notorious possession of the premises; that, not admitting any obligation to pay anything, he has offered W. T. Burgess one hundred dollars to compromise the matter and relinquish his claim, but he demands two thousand dollars therefor.    Charges combination and confederacy to defraud complainant; calls upon defendants to answer not under oath, and prays that the sheriff's sale be set aside as fraudulent, and the several conveyances from the sheriff to John S. Burgess, from him to Samuel P. Burgess, be set aside and cancelled, and decreed to convey to complainant, and that W. T. Burgess be decreed to restore complainant in all things in respect to the title of said premises to as good condition as at the time of said sheriff's sale, and that defendants' and agents' attorneys, etc., be restrained from selling or incumbering the property, or disturbing complainant in the possession of it, and from proceeding in the ejectment suit, and from commencing or instituting any suit at law to recover the possession of the premises, and for general relief.

This bill is sworn to before the clerk of the Circuit Court of Winnebago county, and an injunction awarded by the Circuit judge, December 18, 1855.

William T. Burgess, in his answer, admits there was considerable misunderstanding as to the amount due from complainant to Stone, growing out of their dealings existing prior to the commencement of the suit of Stone against Thomas, and to procure a settlement and adjustment, the suit was commenced and prosecuted by defendant, with one Fuller for Stone; denies all knowledge of the true merits of the controversy between them; denies any promise or obligation to make any discount on the judgment; admits purchase of judgment from Stone, issuing execution, levy and sale, and claims they were all regular; charges willful *laches* on complainant, and claims the benefit of lapse of time; denies all fraud and unlawful combination.

The answer of H. O. Stone sets up lapse of time as a bar to any relief—says before the alias *fi. fa.* was issued, he had sold

the judgment to W. T. Burgess, after deducting the payment of thirty-one dollars thereon, and disclaims all interest, and denies all fraud, etc.

S. P. Burgess sets up in his answer lapse of time and *laches* of complainant; claims to be a *bona fide* purchaser for a valuble consideration, without notice of any irregularities in sale by sheriff, and denies that any exist, and as to the rest and residue of the bill, says that he denies all the facts set up in it to be true, except such as appear of record in the judicial proceedings, and the sale under them, and the different mesne conveyances from Farnsworth to him; relies on the certificate of purchase as the best evidence of what there occurred, " made so by statute," and denies all fraud, etc. The name of W. T. Burgess is signed as of counsel.

At the February term, 1856, a general replication was put in to these answers. At October term, 1856, the death of complainant was suggested, and the present complainants, his heirs at law, admitted to prosecute the suit.

At the October term, 1857, the cause was heard on the bill, answers, and the following evidence:

*John S. Burgess*, sworn, testified that he was a brother of William T. Burgess, and resided in Chicago, September 30, 1855; was the person who executed the deed shown (a deed executed by witness to S. P. Burgess). Acquired the title through him. Don't know from whom he got the title. Never had a deed of the premises in his possession. Paid a consideration, by a note, for $250; gave the note to William T. Burgess. Don't know what has become of it. It was paid by selling the premises to William T. Burgess. Was given up by him in September, 1855. He held it a year, and gave it up when the premises were conveyed to him, in September, 1855. Owed him some borrowed money besides—some $40 or $50. Never had any dealings with any one but William T. Burgess about the land, and conveyed it at his request. Samuel P. Burgess is cousin of William T. Burgess, and was residing in Morris, Grundy county, in September, 1856. Does not know, and never took any interest to know, the value of the property. Does not know whether S. P. Burgess was worth any property or not in September, 1855.

On cross-examination, the witness stated that he went into business in 1854, and William T. Burgess let him have $250, and took his note, which is the note testified about. This note was given up at the time the deed was executed. At the same time, S. P. Burgess gave one note for $2,000, and one for $1,000, which were indorsed and left with Wm. T. Burgess.

Being shown the deed, the witness stated that his impression, when first examined, was that he gave the deed to William T. Burgess; was told by William T. Burgess that he had sold the premises to S. P. Burgess, and he wanted witness to convey. It was the understanding that the account between himself and William T. Burgess would be squared by his conveying to S. P. Burgess.

On re-examination by complainant, witness stated that he saw S. P. Burgess in Chicago about the time, but did not remember seeing him the day the deed was made.

Complainants gave, in evidence, the execution and alias executions, and indorsements in the case of H. O. Stone *v.* Alden Thomas.

*King H. Milliken* testified that he was sheriff of this county at date of execution; has seen this execution; remembers the transaction referred to by the execution and its indorsements. The property described in the levy on the execution is on the east side of the river, south side of State street.

The complainants propose to the witness this question: What was the value of the property in September, 1855?

To which the defendants object, but the court allows the same to be put and answered.

Thinks the buildings were on at that time; was then worth three thousand dollars, with the buildings on. Front width, twenty-two feet; and in June, 1854, the property was worth fifty dollars per foot, front.

The property was advertised under this execution; it was adjourned several times—don't know how often—for want of bidders. Wrote to W. T. Burgess, and received a line from him. Wrote, in the first place, the day to which I had adjourned sale, and received a line from him—if he was not there, to strike it off in the name of John F. Farnsworth. On the day of sale, the property was sold as he directed. He wished witness, in his line to him, to send him a certificate of sale to Farnsworth, and did so. Recollection not distinct about it, nor whether there was any person present or not. A gentleman by the name of Leavitt, an attorney, had an office in witness' office; if he was not there, does not know of any one that was. No one was present to make any bids. It is his impression that it was not cried off; impression not very distinct. The place of sale was at the court-house door. Office was in the east wing of the court-house. Has not now any recollection of going any nearer than his office.

On his cross-examination, he says his recollection is not distinct as to offering the land for sale; cannot state from recollection that it was not offered for sale; recollects making out and

sending a certificate of sale to W. T. Burgess, but has no recollection whether he went to the court-house door and cried the premises for sale or not; will not swear positively that he did not go to the door of the court-house and cry the land for sale; his attention was first called to the sale at the time the sheriffs' deed of the same was executed; his attention had not been called to it from the time of the sale up to the making of the sheriffs' deed of the same.  Called on Alden Thomas, the defendant in the execution, for property on the execution, and asked him to turn out property on the execution; asked him several times.  He did not turn out any property on the execution; examined the record to find property to levy on, and found a farm and this lot.  Knew his duty as sheriff required him to cry the property for sale at the place advertised therefor, and when he made out the certificate of sale to Farnsworth, supposed he had complied with the law in that respect.

The defendants here introduced and read the certificates of sale, which, with their indorsements, are as follows:

STATE OF ILLINOIS, } ss.
  WINNEBAGO COUNTY. }

I, King H. Milliken, sheriff of the county and State aforesaid, do hereby certify that by virtue of an execution and fee bill to me directed, dated the 28th day of December, A. D. 1853, and delivered in favor of Horatio O. Stone and against Alden Thomas, I did, in pursuance of the statute in such case made and provided, on the 10th day of June, 1854, between the hours of ten o'clock, A. M., and five o'clock, P. M., offer at public sale the following described property, to wit: (here follows description of lands,) and John F. Farnsworth, having bid the sum of 38 33-100 dollars, he being the highest and best bidder at sale, became the purchaser. Now, if the aforesaid property shall not be redeemed within fifteen months from this date, according to law, then the said John F. Farnsworth will be entitled to a deed therefor.

Witness my hand and seal at Rockford, this 10th day of June, A. D. 1854.

                                    K. H. MILLIKEN,      [SEAL.]
                                    *Sheriff of Winnebago County.*

September 12, 1855.  Deed executed on the within to John S. Burgess, September 12, 1855.

An assignment from Farnsworth to John S. Burgess.

Another certificate of the same tenor, and indorsed, recorded June 17, 1854.

The witness further said these certificates of sale were executed by him as sheriff of Winnebago county.

The defendants here moved the court to exclude the testimony of said Milliken given in the trial of this cause, tending in any wise to conflict with said certificates, or the facts therein stated.

The court refused to exclude the same, and the defendants excepted.

The defendants then showed the witness a paper writing, purporting to be a copy of a letter written by the witness, and witness says he thinks the copy of the letter now shown him is a copy of a letter he wrote and sent to W. T. Burgess; don't recollect comparing it with the original with Orren Miller.

For the purpose of introducing said copy, the defendants here produced Orren Miller, who was sworn, and says he got the original, of which the one produced (the one above alluded to) is a copy, from W. T. Burgess; he had the original in the court room during one of the terms since this suit was pending. Milliken, witness, and Burgess, looked over original, and Burgess and witness compared it with this, and this is a true copy of the original. The original was in the handwriting of said Milliken; witness wanted to use the original in another suit; took the original away with him; has searched for it during this term of the court; had it in his office, but is unable to find it; it is lost.

The cross examination of K. H. Milliken was then continued by the defendants.

Wrote a letter of the purport of this to W. T. Burgess at the time he sent him the certificate of sale to John F. Farnsworth. Witness reads the copy through, and then says it contains in substance a statement of what he wrote Wm. T. Burgess in regard to the sale of said land.

The said copy is here read to the court by the defendants, as follows:

ROCKFORD, June 10, 1854.

MR. BURGESS: SIR: I this day struck off to John F. Farnsworth, Esq., a part of a city lot belonging to A. Thomas, on the execution in favor of H. O. Stone, for the amount of damages and costs, $38 33, as per order from you. The costs (clerk and sheriff,) are $15 95; you can remit the same, and I will forward you the certificate of sale, also a receipt to attach to the writ.

Yours, respectfully,   K. H. MILLIKEN,
*Sheriff Winnebago County, Ill.*

Re-examined by complainant. Witness' attention called to the return on the execution, says: That is the return made at the time, according to the best of his recollection, the transaction being some time ago, and has not given the matter much thought. All the sale was the indorsement on the execution, and the certificates of sale, but is not positive. Thinks the indorsement of payment of fees was made a few days after; the other indorsement was made at the time of sale. Recollects W. T. Burgess calling his attention to the return, and saying he wanted him to alter it, that the sale was made to Farnsworth. But as the matter was in court he preferred not to do it.

Cross-examined by defendants. W. T. Burgess said to him that the sale was made to Farnsworth, and he ought to alter it. Agreed with him that it was made to Farnsworth, but said he would not correct it. Then told W. T. Burgess that the sale was regular so far as he knew. Thinks he has so told Mr. Burgess several times.

Re-examined by complainants. The sale was made to Farnsworth by the direction of W. T. Burgess, by his letter. Considered the sale made to Farnsworth; his reasons for it were the directions that he had from W. T. Burgess. Thinks no bidders were there at the sale.

*Wm. A. Marsh* testified that he resided in Chicago in 1855, and had an opportunity of knowing the pecuniary circumstances of Samuel P. Burgess; he had no means except his salary; about that time he stated that he had no means, and wanted a situation as clerk.

*Jason Marsh* testified he was acquainted with Alden Thomas, and had been since he can remember; has known W. T. Burgess since 1841; was the attorney for A. Thomas in the suit of H. O. Stone against him, in which the execution in this cause was issued. Previous to the trial of this cause, W. T. Burgess and witness, or Mr. Fuller, or both, or which is not positive, talked about the question that was to be tried.

The defendants here object to any evidence being given either as to what occurred at the trial of said cause, or going behind or *dehors* the record of the judgment therein; but the court overruled the objections severally, and allowed the evidence to be proceeded with touching the said trial as hereinafter given.

The understanding was that the only thing in controversy was the amount of fees to Burgess, as attorney, which he claimed Thomas had to pay him. That was understood to be the question in controversy. At the trial, Mr. Burgess was the only witness sworn. Mr. B. Shaw was also sworn as to the state of the account, both by the defendant, Thomas. At the trial a certain charge came up that Thomas claimed had been settled; but on the testimony of W. T. Burgess, can't say how it came up, but that item was made a part of the judgment. His recollection is not now very distinct as to what did occur on the trial.

Sometime after judgment, execution being out, talked with W. T. Burgess in relation to it; talked considerable. W. T. Burgess admitted that he was mistaken in his testimony, and held out the idea that he or Mr. Stone, or that he would get Mr. Stone, to relinquish that portion of the judgment. Thinks the amount was from eighteen to thirty dollars; don't recollect anything about the amount, but thinks it would range somewhere

along there.   Communicated the fact to Thomas that Burgess would communicate with Stone to procure him to reduce the amount of the judgment.

On cross-examination.   The money that was paid and indorsed on the execution, was paid after the conversation referred to by witness with Burgess about the reduction of the payment. Thinks Burgess said that he would try to get Stone to make a deduction on the judgment.   After the trial was over, Thomas explained to witness how the mistake had occurred, and witness explained it to W. T. Burgess, and he said he would consult Stone, and try to have Stone deduct the same from the judgment.   Is a brother-in-law of A. Thomas, deceased.

Burgess also admitted that Farnsworth had no interest in the matter, and that no consideration passed between them — was a mere matter of accommodation to Burgess.   Thomas possession of the premises until his death; since then his heirs have had possession.

*William Brown* testified that the premises were worth in September, 1855, $4,000.   The lot was worth in 1854, $60 per foot.

Complainants read in evidence the sheriff's deed.

Complainants here closed, and defendants offered as evidence, deed of the premises from John S. Burgess and wife to Samuel P. Burgess, dated September, 13, 1855, acknowledged September 29, 1855; Record of the suit of *H. O. Stone* v. *Alden Thomas;* execution in said suit, with the sheriff's return; alias execution and sheriff's return; sheriff's certificate of sale to J. F. Farnsworth; assignment of certificate by Farnsworth to J. S. Burgess; and deed from J. S. Burgess to Samuel P. Burgess.

At February term, 1858, a final decree was rendered, dismissing the bill.   The complainants have brought this case here by appeal, and have assigned this as error.

This case appeals strongly to the best feelings of the court, as some of the complainants are infants, contending with an astute and practiced lawyer, who having, as he contends, a legal advantage, is determined to avail himself of it, without regard to any equities supposed by the complainants to exist in their favor.   Though it be such a case, and one of great hardship perhaps, this court is not permitted to violate any rule of law or equity in the effort to afford relief, neither in this or in any other case.   We can only apply those rules to the facts and the circumstances of each case that may be presented.

As is said by Fonblanque in his excellent treatise on Equity, book 1, chap. 1, sec. 3: "In chancery, every particular case stands upon its own particular circumstances; but if the law has determined a matter, with all its circumstances, equity can-

not intermeddle; and for the chancery to relieve against the express provisions of an act of parliament, would be the same as to repeal it. Equity, therefore, will not interpose in such cases, notwithstanding accident or unavoidable necessity; so that infants had been bound by the statute of limitations, if there had been no exception in the act. And although in matters of apparent equity, as fraud or breach of trust, precedents are not necessary, it is dangerous to extend the authority of the court further than the practice of former times."

The discretion given to courts of equity is not by any means an arbitrary discretion in any case, but it is to be governed by rules both of law and equity, which are not to oppose, but each in its turn to be subservient to the others; this discretion, in some cases, follows the law implicitly; in others, assists it and advances the remedy; in others again, it relieves against the abuse or allays the rigor of it; but in no case does it contradict or overturn the grounds or privileges thereof, as has been sometimes ignorantly imputed to this court. *Cowper* v. *Cowper*, 2 Peere Williams, 753, by Sir Joseph Jekyl, master of the rolls.

In *Bond* v. *Hopkins*, 1 Schoole and Sepoy, 428, Lord REDESDALE said, "There are certain principles on which courts of equity act, which are very well settled. The cases which occur are various, but they are decided on fixed principles. Courts of equity in this respect have no more discretionary power than courts of law."

And Blackstone, in 3 Com. 432, says, "The system of our courts of equity is a labored connected system, governed by established rules, and bound down by precedents from which they do not depart, although the reason of some of them may be liable to objection."

The rules of evidence, also, are the same in equity as at law. No case, therefore, can be determined in equity, on any other than fixed rules and principles applied to the particular case. And the chancellor, like a jury, can draw his inferences from the testimony, and, like them, weigh it, and as it preponderates, so decree.

It is a rule in equity, that a party to a suit, purchasing property sold under an execution, is chargeable with notice of all irregularities attending the sale; and so is his attorney, who conducts the proceedings.

It is also a rule, that a party shall not claim a benefit, or the aid of such a court, who has been guilty of *laches* in protecting his rights, unless that *laches* may be imputable to the party claiming against him.

The bill in this cause avers, in positive terms, that complainant had no knowledge of the sale of the property in question, until he was told that it had been sold by the sheriff, and the deed actually executed and recorded. The sheriff testifies, that when he had the execution against him, he called on him to settle, and complainant told him he must take property. The complainant endeavors to account for his apparent negligence, and states these facts : That in the suit by H. O. Stone against him, the only matter of real difference between them was, a small sum of fifteen dollars, being the fee of one of the defendants, as attorney for Stone ; that he had paid on the demand thirty-one dollars ; and that on the trial, Burgess was sworn as a witness, and by his testimony, the amount of the recovery against him was much greater—some forty-five dollars. Burgess admitted, —so Jason Marsh testifies,—there was a mistake in his testimony, and said he would see Stone about it, and have it rectified. This is not denied by Burgess. The complainant states, when execution was issued on the judgment, in June, 1850, he paid on it $31 and the costs, which Burgess received, and remonstrated against paying more ; that the execution was returned by order of Burgess, and that he heard nothing more of it until January, 1854, when a *fi. fa.* was issued for the balance ; that on telling the sheriff the facts of the case, he consented to wait until complainant could write to Burgess ; that he did write to Burgess about it, and receiving no reply to his letter, he supposed the matter was all adjusted, and gave himself no further concern about it, and was only awakened from his delusion by being told of the actual sale of his property and a deed made and recorded for it. Supposing he was dealing with an honorable man, in the person of Mr. Burgess, of high standing at the bar, whose professional robe indicated the higher virtues, he might well consider he was secure in relying on his promise,—for such it was,—to have the mistake, which he had produced by his own testimony, corrected. Instead of that, however, without communicating with the complainant in any way, he becomes the purchaser of the judgment, and enforced the collection of the whole of it, by the sale of valuable property, worth at that time some twelve or thirteen hundred dollars, for the trifling sum of thirty-eight dollars and thirty-three cents, and at the time of the hearing of this cause, worth some four or five thousand dollars. We do not hold this promise of Burgess to see Stone, and have the mistake rectified, was of binding legal obligation,—not at all ; but, when coming from a member of an honorable profession, in whom no improper designs can be presumed to lurk, the complainant was well justified in supposing that he had done as he said he would do, that

the whole matter was adjusted, and it should trouble him no more. It was a reasonable inference from Burgess' silence.

But be this as it may, assuming it to be true that the complainant knew of the levy and sale, was the sale conducted in the manner prescribed by law, and is the defendant chargeable with knowledge of any irregularities, or serious departure from the requirements of the law in sales by sheriffs?

It must be confessed, the witness on the first point as to the regularity of the sale, the sheriff himself, is not so positive in his statements as he might be; but this fact distinctly appears from what he does say—that, in truth and in fact, there was no public sale of the property whatever. Our statute, R. L. 1845, chap. 57, sec. 11, provides that " no lands or tenements shall be sold by virtue of any execution aforesaid, unless such sale be at public vendue, and between the hours of nine in the morning and the setting of the sun of the same day." Provision is then made for public notices of the sale, and a penalty against the sheriff of fifty dollars if he sells otherwise, with this proviso: " Provided, however, that no such offense, nor shall any irregularity on the part of the sheriff, or other officers having the execution, be deemed to affect the validity of any sale made under it, unless it shall be made to appear that the purchaser had notice of such irregularity."

The sheriff states that all the sale he made of this property was, by sitting in his office, in the east wing of the court-house, and there indorsing it on the execution, and making out a certificate of sale; that he did not go to the door of the court-house; that there was no public vendue, no bidders, no outcry, nothing transpiring there to arrest the attention of the public, or any indication that a sale of valuable property by the sheriff was going on. The fact may be, that at the very moment, whilst the sheriff, privately in his office, was making this indorsement, the owner of the property, the complainant, may have been at the door of the court-house.

One reason why such sales are directed to be at public vendue is, that by the very publicity of it, not only bidders may be attracted, but that the defendant himself may be present to see and know that every thing is fair; it is a great protection to unfortunate debtors. Had the sale in this case been public, if the debtor did not know of it himself, some friend might have known it, and so communicated the fact. But the sheriff obeyed not the law, but the direction of the plaintiff's attorney, who, it is very evident, had matured his plans to possess himself of this property, for the little trifle due on the execution, and which he had induced the complainant to believe no longer existed as a balance against him.

A stranger to these proceedings would not, and justly, too, be affected by them ; for effect must, from motives of public policy, if for no other cause, be given to sales of this character, and he has a right to repose upon the presumption that the officer has done his whole duty in the premises.

It is not so with the plaintiff in this suit, and in this aspect W. T. Burgess is viewed by the court, because he says, before the issuing of the alias execution, he had become the purchaser of the judgment from Stone, and had been and was the attorney of the plaintiff, Stone.

In such case the rule is, that where the plaintiff in the judgment becomes the purchaser, he is responsible for and is supposed to be cognizant of all the irregularities and errors, both in the judgment and in the proceedings under the execution. *McLagen* v. *Brown et al.*, 11 Ill. R. 523, 524.

That W. T. Burgess was the purchaser, distinctly appears by the sheriff's return on the execution, and his return must be conclusive ; it cannot be explained away by parol, or by the production of Burgess' letter to him to strike it off to Farnsworth ; nor would he be any less the purchaser, under the facts as they are proved here, if the sheriff's return actually showed that Farnsworth was the purchaser, for he disclaimed all knowledge of it, or having any interest in it. He would be the trustee, only, of Burgess, holding the title for him. So with John S., his brother, and with his co-defendant, Samuel P. Burgess, his cousin. They were but trustees for the benefit of William T. Burgess.

Look at John S. Burgess' testimony. It is enough to satisfy any mind that he was used—under the influence of an older brother as cunning as one well taught in the chicanery of his profession could well be, it was no difficult matter to make him an instrument for his purposes. His testimony is quite sufficient to show he was a mere instrument. " He does not even know from whom he got the title." Had given his brother a note for $250, and paid it by selling the premises, worth $4,000, to his brother—conveyed the land to Samuel at William's request ; never had any contract with Samuel to convey him the land ; never took any interest in the property. He says, moreover, that William T. Burgess told him that he had sold the premises to S. P. Burgess, and he wanted him to convey it to him. This shows he was a mere trustee.

So with S. P. Burgess. The proof shows that he never was in a condition to buy such property, and the inference is irresistible, as J. S. Burgess conveyed the land to him without his knowledge, and at the request of W. T., he also is but a trustee for W. T. Burgess. They are all " art and part " in a fraud-

ulent transaction.   It would be a just reproach upon a court of equity, if W. T. Burgess could be permitted to interpose either of these persons between him and the censure of this court. It was one of the many artifices Burgess resorted to to cover up his fraud and escape detection, and have it in his power to allege that neither the plaintiff in the execution nor his attorney was the purchaser.   But such shallow devices and fraudulent practices cannot avail him.·  He, in the eye of justice and of the law, concocted this scheme—he was the moving spring of the sheriff's illegal action; he pressed into his service Farnsworth, his brother John, and his cousin Samuel, a co-defendant with him, drew up his answer, and taught him upon what to insist.   They were all animated by his soul, and in that, there brooded a wicked design.

The direction to the sheriff, " if there are no bidders, strike it off to Farnsworth," was a sufficient intimation to a very obliging sheriff that it would be perfectly agreeable to him, that there should be no bidders, so that he might, at a future day, by the train he had laid, become the owner without being chargeable with any irregularities in the sale.   Irregularities is a term too mild by which to characterize these proceedings — they were gross abuses in the face of justice, and would be condemned. every where.   It is an old maxim that it is the very essence of fraud to attempt to cover up fraud.

If he had not some design of this character, if he was conscious every thing was fair, just and honest, why did he not appear in all the papers—in the certificate and sheriffs' deed, as he did appear in the sheriff's return the real purchaser, as he was, of the property.   When the sheriff made his return, that he was the purchaser,·he saw at once, and knew he would be affected by the abuses committed, and he endeavored to induce the sheriff to amend the return.   But in such a case as this is, · we will hold the sheriff to it, and consider the fact as true, that Burgess was the purchaser, as shown by his return.

Being so, issuing the certificate to Farnsworth was a void act, for it could only issue to Burgess himself, who appears on the return as the purchaser.   Chap. 57, sec. 12, R. S. 1845.

We hold that there must be entire conformity in all these proceedings in the return, the certificate and the deed, and if they do not possess it, they will be invalid.   *Davis* v. *McVickers*, 11 Ill. R. 329.

But there is another ground on which the complainants might well seek the interposition of this court, and that is, the gross inadequacy of price.

We do not mean to be understood as intimating, that at a judicial sale at public vendue or sale by auction, conducted

fairly, and in conformity with the statute, that inadequacy of price could be urged as ground for setting aside a sale. *Ayres v. Baumgarten*, 15 Ill. R. 444. There would be no necessity, under our system of laws, to contend very strenuously for such a principle, because, having a right to redeem, no permanent injury need be worked by it, or valuable estates sacrificed. But where, as in this case, the requirements of the statute were spurned—where there was no public vendue, no bidders, and no outcry—gross inadequacy of price, such as is here exhibited, ought to have a most decided influence, and be in fact, a controlling element.

Nor do we mean to be understood as objecting to receiving a bid by letter—but the officer must cry the bid, and if there be no advance on it, he would be justified in selling at the bid. The debtor has a right to insist upon all the forms.

We did design to bring out in stronger relief the acts of the principal defendant in this cause, who has exercised a power his position gives him, for such a bad purpose. We did intend to administer to him a well merited rebuke, as pointed as it is true, but have thought we would leave him to reflect how much sweeter and more consoling would be to him the whispers of his conscience, if he had endeavored, by the exercise of his talents and sagacity, to save this estate to those entitled to it, rather than by his cunning and craft to deprive them of it.

The decree is reversed, and a decree entered in this court, that on payment to William T. Burgess, by the said complainants, of the amount for which the lot and land in question was sold, and all the costs, with interest thereon from the day of sale, the said William T. Burgess and Samuel P. Burgess, do make a quit-claim deed, in due form of law and properly acknowledged, to the said complainants, for the lot and land in controversy, releasing to the heirs at law of said Alden Thomas, all their right, title and claim of, in and to said lot of ground and premises and appurtenances, and that the complainants recover their costs herein. And on failure to execute said deed by said defendants, within thirty days from and after the payment of the money aforesaid, then the Master in Chancery of Winnebago county, do make, execute, acknowledge and deliver such deed.

*Decree reversed.*